COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-011-CV

 

 

IN THE INTEREST OF T.A.M. 

AND B.G.W. A/K/A Z.W., 

CHILDREN

 

                                              ------------

 

           FROM
THE 323RD DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








Appellants
P.M. and N.W. appeal the trial court=s order
terminating their parental rights to their daughters T.A.M. and B.G.W. a/k/a
Z.W.  After a bench trial, the trial
court found by clear and convincing evidence that P.M. and N.W. engaged in
conduct or knowingly placed the children with persons who engaged in conduct
which endangers the physical or emotional well-being of the children, knowingly
placed or knowingly allowed the children to remain in conditions or surroundings
which endanger their physical or emotional well-being, and constructively
abandoned the children.[2]  The trial court also found that termination
of the parent‑child relationships would be in the children=s best
interest.  We affirm the trial court=s
judgment of termination.

N.W.








In her
sole issue, N.W. argues that the evidence is factually insufficient to show
that termination of her parental rights is in the children=s best
interest.  In reviewing the evidence for
factual sufficiency, we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.[3]  We must determine whether, on the entire
record, a factfinder could reasonably form a firm conviction or belief that the
termination of the parent-child relationship would be in the best interest of
the child.[4]  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.[5]

There is
a strong presumption that keeping a child with a parent is in the child=s best
interest.[6]  Prompt and permanent placement of the child
in a safe environment is also presumed to be in the child=s best
interest.[7]  The following factors should be considered in
evaluating the parent=s willingness and ability to
provide the child with a safe environment:

(1) the child=s age and physical and
mental vulnerabilities;

 

(2) the frequency and nature of out‑of‑home placements;

 

(3) the magnitude, frequency, and circumstances of the harm to the
child;

 

(4) whether the child has been the victim of repeated harm after the
initial report and intervention by the department or other agency;

 

(5) whether the child is fearful of living in or returning to the
child=s home;

 

(6) the results of psychiatric, psychological, or developmental
evaluations of the child, the child=s parents, other family members, or others who
have access to the child=s home;

 








(7) whether there is a history of abusive or assaultive conduct by the
child=s family or others who
have access to the child=s home;

 

(8) whether there is a history of substance abuse by the child=s family or others who
have access to the child=s home;

 

(9) whether the perpetrator of the harm to the child is identified;

 

(10) the willingness and ability of the child=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness and ability of the child=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

(12) whether the child=s family demonstrates adequate parenting skills,
including providing the child and other children under the family=s care with:

 

(A) minimally adequate health and nutritional
care;

 

(B) care, nurturance, and appropriate discipline consistent with the
child=s physical and
psychological development;

 

(C) guidance and supervision consistent with the child=s safety;

 

(D) a safe physical home environment;

 

(E) protection from repeated exposure to violence even though the
violence may not be directed at the child; and

 

(F) an understanding of the child=s needs and capabilities; and








(13) whether an adequate social support system
consisting of an extended family and friends is available to the child.[8]

 

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)    the desires of the child;

 

(B)    the emotional and physical needs of the
child now and in the future;

 

(C)    the emotional and physical danger to the
child now and in the future;

 

(D)    the parental abilities of
the individuals seeking custody; 

 

(E)    the programs available to assist these
individuals to promote the best interest of the child;

 

(F)     the plans for the child by these
individuals or by the agency seeking custody;

 

(G)    the stability of the home or proposed
placement;

 

(H)    the acts or omissions of the parent which
may indicate that the existing parent‑child relationship is not a proper
one; and

 

(I)     any excuse for the acts or omissions of the
parent.[9]








These
factors are not exhaustive.  Some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.[10]  Furthermore, undisputed evidence of just one
factor may be sufficient in a particular case to support a finding that
termination is in the best interest of the child.[11]  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.[12]

The
evidence showed the following.  Neither
T.A.M., born April 4, 2007, nor B.G.W., born February 25, 2008, ever lived with
N.W., who also had two older daughters in the custody of the State at the time
of trial.

N.W.
grew up in an unstable household; her mother was a crack cocaine addict who
still used drugs at the time of trial. 
When N.W. was twelve years old, she tried to strangle herself.  When she was thirteen, she attempted to
overdose on medication.  She was pregnant
with her first child by the age of fourteen.








N.W.,
who was twenty-three years old at the time of trial, began using marijuana when
she was seventeen years old and was using it heavily by the time she had her
second child.  She told Nichelle Wiggins,
who performed her psychological evaluation, that she used marijuana during her
pregnancies but that she stopped using in December 2007.  N.W. testified that she used marijuana
heavily three to four years, including during her pregnancy with T.A.M., but used
only off and on during her pregnancy with B.G.W. because she was Alearning
how to be sober.@ 
When asked whether continuing smoking was a good decision, she
responded, AWithout guidance, how am I going
to know what=s good and bad?  That=s the
same with my kids.  How am I going to
know what=s right and wrong if I don=t have
no one to tell me this is right and this is wrong?@  She admitted at trial that she had not had
such guidance in her life and that she had no support system.  She had told Wiggins that her children were
her support system.

Wiggins
testified that N.W.=s addiction to drugs was strong,
as exemplified by her inability to stop using drugs during her pregnancies
despite her knowledge of the risks to her unborn children.








T.A.M.
and B.G.W. both tested positive for marijuana at birth.  N.W. tested positive for marijuana at T.A.M.=s birth
and admitted to smoking marijuana within three days before B.G.W.=s birth
and only a day after testing negative for marijuana.  During the pendency of the case, N.W.
completed a twenty-four-hour outpatient drug treatment course, with classes
once a week for about two and a half months, but she tested positive for drugs
even after treatment.  She was tested
about once every two months until November 2008.  Joy Denney, one of N.W.=s CPS
caseworkers, testified that N.W.=s only
negative test was in February 2008.  N.W.
claimed that she had more than one negative drug test but admitted using
marijuana in August 2008, a month before trial was originally set.  She testified that she did not take a drug test
in the week before trial because of transportation issues.

N.W.
testified that many things trigger her to use marijuana:  thinking about her children, CPS=s focus
on what she was doing wrong instead of what she was doing right, and even
things going well in her life.

T.A.M.
was born with medical issues, including short gut syndrome, that required her
to stay about six months in the hospital after her birth.  Originally, the State=s plan
was for T.A.M. to be transitioned into N.W.=s care
after T.A.M.=s release from the
hospital.  The service plan=s goals
for N.W. included stable employment, stable housing, and drug assessment and
treatment.  But at the time of T.A.M.=s
release, N.W. did not have stable housing or stable employment, and she was not
compliant with drug testing.  T.A.M. was
placed in a primary-medical-needs foster home upon her release from the
hospital.  N.W. testified that she Atook it
as a joke@ when T.A.M. was removed.








A new
service plan was created in October 2007 when CPS caseworker Denney was
assigned to the case.  It required the
parents to learn to care for a medically fragile child, complete a drug
assessment and follow through with recommendations, complete a psychological
evaluation, and maintain a safe and stable home.  P.M. was required to obtain and maintain
stable employment; that was not a requirement for N.W., but Denney encouraged
her to also obtain and maintain stable employment. 

In
January 2008, after N.W. told Denney that they were being evicted and that she
did not know where they would go, CPS removed N.W.=s older
two children because of the homelessness and N.W.=s
continued drug use.  Those children were
placed in a basic foster home.

Around
this time, Denney discovered that N.W. was pregnant.  N.W. had received no prenatal care
beforehand.  B.G.W. was born on February
25, 2008, and placed separately from her siblings because there were no
additional openings in their foster homes. 
At this time, according to Denney, N.W. and P.M. still had no specific
plan to improve their lifestyle.

By
February 2008, N.W. and P.M. had found an apartment, but when Denney visited,
she discovered that it had no place for the children to sleep, bugs were
crawling in the cabinets and kitchen, and bags of trash were lying on the
floor. 








N.W. did
not take parenting classes before September 2008 or offer any explanations,
despite Denney=s recommendations.  On cross-examination, Denney admitted that
N.W. had taken an eight-hour relationship course offered by The Parenting
Center but stated that she had explained to N.W. that the parenting classes had
to be parenting classes.  Denney
testified that the parents had never told her that there was an issue with
going to the Parenting Center.  Denney
also admitted that Volunteers of America (VOA) offered parenting classes at
home but noted that the parents had to have stable housing to qualify and that
N.W. had not qualified while Denney was her caseworker.

Denney
testified that N.W. had completed training regarding T.A.M.=s
medical issues but opined that such training was not as pertinent at the time
of trial because of T.A.M.=s
improvement.

Denney
testified that N.W. did not complete any individual counseling despite
recommendations and provided no explanations. 
Denney admitted that she could not confirm whether N.W. went to
counseling because the counselor that N.W. was supposed to go to would not
release any information, and N.W. did not obtain a release or notify CPS that
she had done so.  N.W. testified that she
gave CPS proof that she saw the counselor but that Denney said that it was not
good enough.  But N.W. also admitted that
she did not complete counseling.

N.W. did
not have any stable employment before September 2008.








When
Denney went on maternity leave in September 2008, N.W. was still in the same
apartment that she and P.M. had shared since February 2008, but she had no job,
P.M. did not report stable employment other than day labor, and both of them
still tested positive for drugs.  Denney
did not believe that the parents had done anything to convince her that the
children would be safe in their home, and she believed that termination was in
the children=s best interest.  She believed that the parents had not
substantially complied with the service plan. 
Specifically, she did not believe that N.W. had complied because she had
not fully completed the recommendations from the psychological evaluation or
parenting classes, had not obtained stable housing, and had continued to test
positive for drugs.

Michael
Tolle, the third CPS caseworker, who staffed the case from October 27, 2008
until mid-December 2008, the time of trial, testified that at the original trial
setting in September 2008, the parents had requested a continuance so that they
could work their services, including taking drug tests and completing parenting
classes and individual counseling.  They
had no housing at the time.  The drug
tests that they took in September 2008 came back positive.  N.W. reported on December 3, 2008, less than
two weeks before trial, that she was getting an apartment, but Tolle had not
yet visited the apartment as of the time of trial.  An initial meeting between VOA and N.W. had
also occurred in December 2008 before trial. 
The caseworker had not set up individual counseling, nor had the parents
requested it.








The
parents missed visits with the children in November 2008.  Overall, P.M. visited the children maybe five
times over the approximately fifteen months of CPS custody before trial
began.  N.W. visited faithfully at first
but missed some visits in the spring of 2008 because of transportation issues
and missed several visits in a row in the summer of 2008.  She testified that she went to Minnesota to
get Aa mental
break@ from
Texas.

Tolle
also testified that N.W. had had enough time to obtain stable housing but did
not have it at the time of trial.  She
testified that she had been in her apartment for a week.  Tolle testified that he did not believe that
either parent was in a position to provide the children with a safe and stable
home.  Further, he testified that neither
parent had demonstrated any changes to the lifestyle that had necessitated the
removals in the first place.

On
cross-examination, Tolle admitted that it was potentially possible that the
parents could achieve more stability with more time.  As Wiggins pointed out, while parents
sometimes need more time, 

[Y]ou still have children who are developing and growing and they need
some stability and they need to know who their primary caregivers are going to
be and who is going to be there to nurture them and develop them, and children
can=t always sit and wait
while Mommy and Daddy get it together.

 








Denney
testified that the permanency plan for the two little girls if termination
occurred would be adoption and placement together.  B.G.W.=s foster
parents want to adopt both children. 
T.A.M.=s foster home is not adoption
motivated.  Tolle testified that T.A.M.
had no medical needs and that he knew of no impediment to placing her in the
home in which B.G.W. already resides.

B.G.W.
has done well in her foster home.  Her
foster mother testified that she had been in their home almost ten months and
was healthy, happy, and beginning to walk. 
The foster mother admitted that she had seen T.A.M. briefly in the car
with a CPS employee before visits but had had no interaction with her.  She testified that A[i]t=s scary
to take a baby that we haven=t had a
relationship with, but [B.G.W.] is such an amazing part of our family, we
figure [T.A.M.] probably will be, too.@  The foster mother had been told only the week
before trial that T.A.M.=s status had been changed from
medical to basic.

In fact,
testimony showed that T.A.M. had improved greatly.  At the time of trial, she no longer needed
oxygen or a feeding tube or any ongoing care or treatment that would require
her to be in a primary-medical-needs home.

B.G.W.=s foster
mother testified that she knows that there will be some diet issues and
challenges and some research necessary in caring for T.A.M.  She testified that she and her husband are
open to a smooth transition and adoption and that they would be committed to
providing the two little girls a safe and stable home for as long as they need.








Based on
our review, we hold that the evidence is factually sufficient to support the
best interest finding.  We overrule N.W.=s sole
issue.

P.M.

P.M.=s court‑appointed
appellate counsel has filed a motion to withdraw and an Anders brief in
support stating that after diligently reviewing the record, he believes that
any appeal by P.M. would be frivolous.[13]

On April
1, 2009, we sent P.M. a letter notifying him of his due date to inform this
court if he desired to examine the record and file a pro se brief in response
to his counsel=s motion to withdraw and Anders
brief.  The letter was returned, with the
envelope bearing the U.S. Post Office notations AReturn
to Sender,@ AAttempted
B Not
Known,@ and AUnable
to Forward.@ 
Additionally, P.M.=s appointed counsel informed
this court that the copies of his motion to withdraw as counsel and Anders
brief mailed to P.M. at the address provided to counsel were also not delivered
to P.M. but were returned to counsel by the U.S. Post Office.








In the
interest of justice, we abated the appeal and remanded this case to the trial
court for a hearing.  Despite evidence
that caseworker Tolle had given P.M. written notice of the abatement hearing,
P.M. did not appear.  Tolle had asked P.M.
for a physical and mailing address; P.M. told Tolle that he was staying with
different friends but did not give him an address.  The record indicates that Tolle would attempt
to give P.M. a copy of the Anders brief at the next visit with N.W.=s older
daughters.  P.M. has not filed a response
to the Anders brief.[14]  The State has requested that we consider the
appeal based on the record.

P.M.=s
appointed counsel=s brief meets the requirements
of Anders by presenting a professional evaluation of the record and
demonstrating why there are no arguable grounds of error to be advanced.[15]  As the reviewing appellate court, we must
conduct an independent evaluation of the record to decide whether counsel is
correct in determining that P.M.=s appeal
is frivolous.[16]

Having
carefully reviewed the record and the appellate brief, we agree with P.M.=s
appellate counsel that his appeal is frivolous and without merit.  We find nothing in the record that might
arguably support the appeal.[17]








Accordingly,
we grant P.M.=s counsel=s motion
to withdraw and affirm the trial court=s
judgment terminating the parental rights of N.W. and P.M. to the children
T.A.M. and B.G.W.

 

PER CURIAM

 

PANEL:  DAUPHINOT, GARDNER, and
MEIER, JJ.

 

DELIVERED:  January 21, 2010











[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code Ann. ' 161.001(1)(D), (E),
(N) (Vernon Supp. 2009).





[3]In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).





[4]Tex. Fam. Code Ann. ' 161.001; In re C.H.,
89 S.W.3d 17, 28 (Tex. 2002).





[5]H.R.M., 209 S.W.3d at 108.





[6]In re R.R., 209 S.W.3d 112, 116
(Tex. 2006).





[7]Tex. Fam. Code Ann. ' 263.307(a) (Vernon
2008).





[8]Id. ' 263.307(b); R.R.,
209 S.W.3d at 116.





[9]Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).





[10]C.H., 89 S.W.3d at 27.





[11]Id.





[12]Id.





[13]See Anders v. California,
386 U.S. 738, 87 S. Ct. 1396 (1967).





[14]See In re Schulman, 252 S.W.3d 403, 408
n.21 (Tex. Crim. App. 2008).





[15]In re D.D., 279 S.W.3d 849, 850
(Tex. App.CDallas 2009, pet.
denied).





[16]See id.; see also Stafford
v. State, 813 S.W.2d 503, 511 (Tex. Crim. App. 1991).





[17]See D.D., 279 S.W.3d at 850; see
also Bledsoe v. State, 178 S.W.3d 824, 827 (Tex. Crim. App. 2005).